IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–00103–EWN–KLM

JOHN PRYMAK,
LILLIAN PRYMAK,
PAUL PRYMAK,
PRESTON SMITH,
SHEILA SMITH,
JANE SPECKETER,
ANTHONY PISANI,
PATRICIA PISANI,
LESLIE DAVIS,
MARJORIE DALE DAVIS,
DARREL LONGLEY,
VERA LONGLEY,
ROBERT DALEY,
BRENDA DALEY,
KENNETH N. PORCHETTA,
LINDA RADLEY,
MARIE MLACNIK,
THE TUCKER FAMILY INVESTMENTS,
LLP,
RICHARD WARREN,
HELEN BARKER,
GARY WHITAKER,
PHYLLIS WHITAKER,
MARCY RICE,
JAMES RICE,
MICHAEL J. VETTE,
BRYAN VETTE,
WILLIAM J. KITCHING,
FLOROANN MILANN,
HELENA LOEWEN,
RUSSELL A. BUTTACAVOLI,
RICHARD BRICE,
PAULA BRICE,
CHAD LUCERO,
SHAWN CULLEN,
JONATHAN SENDOR,
VIRGINIA SENDOR,

JILL SENDOR-LAYCHAK,
DOUGLAS LAYCHAK,
ALI GIDFAR,
MARYAM ZIRAKZAKEH,
MANOUCHEHR ZIRAKZADEH,
SHAHIN ZIRAKZADEH,
CHARLES B. DAVIS,
CHRISTOPHER OLSON,
SANDY OLSON
TEDD SABUS,
TIMOTHY J. GILLACH,
LISA SEEBERGER,
SCOTT SEEBERGER,
JOAN E. McELWAIN,
HARLEY J. KIRSCHENMANN,
CAROL J. KIRSCHENMANN,
PRISCILLA J. DRESSEN,
LEROY MATTICKS,
EDWARD MORROW,
ROBERTA MORROW,
IRENE VALVERDE,
ROBERT VALVERDE,
JAMES FAVILLE,
MARIAN FAVILLE,
DAVID SOBERNHEIM,
MYRNA SOBERNHEIM
JAMES E. LOSHER,
ROBERT WESTON,
VELVA WESTON,
VIVIAN KALLAS, and
FRED FRALEY,

     Plaintiffs,

v.

CONTEMPORARY FINANCIAL
SOLUTIONS, INC., and
MUTUAL SERVICE CORPORATION,

     Defendants.

**ORDER AND MEMORANDUM OF DECISION**

This is a securities fraud case. Plaintiffs John Prymak, *et al.* allege Defendants Contemporary Financial Solutions, Inc. ("CFS") and Mutual Service Corporation ("MSC") are liable for their participation in and failure to protect Plaintiffs from non-party Robert Bryant's fraudulent sale of unregistered securities that have now become worthless. This matter is before the court on "Motion of Defendants [CFS] and [MSC] to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)," filed March 13, 2007. Jurisdiction is premised upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

## FACTS

### 1.    *Factual Background*

The following facts are taken from Plaintiffs' amended complaint and are presumed true for the purposes of this motion.

#### a.        *The Parties*

At all times relevant hereto, Plaintiffs were and are citizens of the states of Colorado, Arkansas, Arizona, California, New York, Connecticut, and Texas. (First Am. Compl. and Jury Demand ¶ 3 [filed Feb. 28, 2007] [hereinafter "Am. Compl."].) MSC is incorporated in Michigan with its principal place of business in Florida. (*Id.* ¶ 5.) On April 29, 2002, MSC incorporated CFS as a wholly owned subsidiary in the state of Delaware with its principal place of business in Florida. (*Id.* ¶¶ 4, 15.) Defendants are broker-dealers in securities registered with the Securities

and Exchange Commission ("SEC") and are members of the National Association of Securities Dealers, Inc. ("NASD"). (*Id.* ¶¶ 4–5.) Defendants are licensed as broker-dealers in securities in all fifty states and are subject to all rules and regulations of the SEC, the NASD, and each of the fifty states. (*Id.* ¶ 11.)

Upon incorporation of CFS, the officers and directors of CFS were the same as the officers and directors of MSC, and the two entities shared the same business address and business purpose. (*Id.* ¶ 15.) MSC stated publicly that it had incorporated CFS for the purpose of hiring associated persons who were semi-retired and retired and who had little or no experience in the securities business, such as lawyers and accountants. (*Id.*) MSC has a history of disciplinary, regulatory, and supervisory problems with the NASD. (*Id.* ¶ 12.) Plaintiffs allege, upon information and belief, that MSC formed CFS because it needed a broker-dealer with no history of disciplinary, regulator, or supervisory problems. (*Id.*) Plaintiffs allege CFS is, in fact, the alter ego of MSC. (*Id.* ¶ 18.) Defendants do not dispute this contention in the context of their motion to dismiss. (*See* Mot. of Defs. [CFS] and [MSC] to Dismiss Pls.' Am. Compl. Pursuant to Fed. R. Civ. P. 12[b][6] [filed Mar. 13, 2007] [hereinafter "Defs.' Br."]; Reply of Defs. [CFS] and [MSC] in Supp. of Mot. to Dismiss Pls.' Am. Compl. Pursuant to Fed. R. Civ. P. 12[b][6] [filed Apr. 16, 2007] [hereinafter "Defs.' Reply"].) Therefore, for the purposes of this motion, I presume CFS is the alter ego of MSC and consider all of Plaintiffs' claims applicable to both Defendants.

Mr. Bryant became a registered representative in securities in approximately 1989. (Am. Compl. ¶ 25.) From June 1989 to October 1990, Mr. Bryant was employed at FFP Securities

until he was discharged for cause. (*Id.*) He was then a registered representative for Great Western Financial Securities Corporation from July 1991 until he was fired in January 1993 for "selling away," which is engaging in securities transactions not reflected on the firm's books by associated persons without prior notice to or approval from the firm. (*Id.*) "Selling away" is unlawful and in violation of SEC and NASD rules. (*Id.*) "Selling away" virtually always involves the illegal sale of unregistered securities, fraudulent activities, and significant losses to investors. (*Id.*) Before February 2003, Mr. Bryant worked for several other small broker-dealers for short periods of time. (*Id.*) In February 2003, Defendants hired Mr. Bryant as a registered representative and associated person, and he remained in their employ until his termination on December 31, 2004. (*Id.*) Defendants permitted Mr. Bryant to operate as an associated person and representative agent in a one-man office in Parker, Colorado. (*Id.*)

### b. *Mr. Bryant's Fraudulent Scheme*

During 2004, while acting as a registered representative of Defendants, Mr. Bryant sold in excess of $3,000,000 in unregistered securities in the form of short-term promissory notes issued by National Consumer Mortgage, LLC ("NCM Notes"), a California company now in bankruptcy. (*Id.* ¶¶ 6, 29.) Several Plaintiffs purchased NCM Notes from Mr. Bryant during this time. (*Id.* ¶¶ 52, 76–120.) These 2004 purchases are currently being arbitrated and are not directly at issue in this action. (*Id.*) In 2005 and 2006, after Mr. Bryant was terminated, he continued to sell approximately $10,000,000 in NCM Notes. (*Id.* ¶ 6.) During this time, each Plaintiff purchased NCM Notes from Mr. Bryant. (*Id.*) These are the transactions at issue in the instant lawsuit. (*Id.* ¶¶ 6, 52.)

Mr. Bryant's sale of NCM Notes was part of a giant ponzi scheme, which is a fraudulent scheme that can be profitable for only a short period of time by paying high returns directly from investors' capital. (*Id.* ¶ 6.) Mr. Bryant represented to Plaintiffs that the NCM Notes he was selling were secured by deeds of trust on real property in California, but there were no deeds of trust and the monies invested by Plaintiffs were withdrawn by NCM's principal for personal use. (*Id.*) NCM's principal has pled guilty to mail fraud and will serve five years in federal prison. (*Id.*) On February 2, 2007, Mr. Bryant filed for personal bankruptcy in Colorado. (*Id.* ¶ 28.) On February 16, 2007, a Colorado State Grand Jury indicted Mr. Bryant on forty-nine counts of securities fraud violations for the sale of NCM Notes. (*Id.* ¶ 29.) Approximately thirty-one counts of the indictment relate to the sale of NCM Notes to Plaintiffs. (*Id.*)

Mr. Bryant appears to have focused his fraudulent NCM Notes scheme, in part, on older people who were already in retirement, sometimes soliciting their purchase of notes from elderly community centers and his church. (*See, e.g.*, *id.* ¶¶ 78, 83, 86, 100, 103, 110, 117.) He discouraged Plaintiffs from investing in stocks and urged them to put their life savings into purchasing NCM Notes. (*See id.* ¶ 76–120.) In many cases, Mr. Bryant induced Plaintiffs to go into debt by mortgaging their homes or taking out home equity lines of credit in order to purchase additional notes. (*Id.*) All NCM Notes are now worthless. (*Id.* ¶ 6.) Plaintiffs have each sustained a complete loss of their investment and many have lost their entire life savings. (*See id.* ¶¶ 6, 76–120.)

### c. Defendants' Response to Mr. Bryant's Fraudulent Scheme

In June 2004, while Mr. Bryant was still working for Defendants, the Arkansas Securities Department ("ASD") initiated an investigation of Mr. Bryant and his sale of NCM Notes. (*Id.* ¶ 7.) The ASD contacted Defendants and alleged that Mr. Bryant was selling unregistered securities in the form of NCM Notes, in violation of the Arkansas Securities Act. (*Id.*) The ASD asked Defendants to investigate Mr. Bryant's sale of NCM Notes, furnish the ASD with the names and addresses of all persons who had purchased NCM Notes, and give the ASD its assurance that Mr. Bryant, as Defendants' representative, would no longer sell NCM Notes. (*Id.*) Shortly thereafter, Defendants represented to the ASD that they had made a thorough investigation of Mr. Bryant's offer and sale of NCM Notes and that Mr. Bryant was not selling the notes. (*Id.*) Defendants failed to provide the ASD with any documentation supporting their alleged investigation, such as a private placement memorandum or NCM's financial statements, and Defendants failed to perform any due diligence examination of NCM. (*Id.* ¶ 41.) Defendants' representations to the ASD were false because, as of August 2004, Mr. Bryant had sold approximately $2,450,000 in NCM Notes. (*Id.* ¶ 7.) Defendants' false representations caused the ASD to refrain from actively pursuing its investigation of Mr. Bryant, who continued to defraud investors by selling NCM Notes through 2006.[1] (*Id.* ¶ 7.)

---

[1]Although this and several of the following allegations state legal conclusions pertinent to the question of causation, because Defendants do not challenge these conclusions in the context of the instant motion, I presume them to be true for the purposes of this order. (*See* Defs.' Br.; Defs.' Reply.)

Further, making all reasonable inferences in Plaintiffs' favor, had Defendants undertaken a proper investigation of Mr. Bryant's offer and sale of NCM Notes, they would have discovered, as investment professionals, that the notes were facially invalid, fraudulent, and their sale was in violation of federal and state securities laws. (*Id.* ¶ 41.) Thus, Defendants knew or should have known of Mr. Bryant's illegal sale of NCM Notes. (*Id.* ¶ 42.) Nonetheless, Defendants did not immediately discharge Mr. Bryant or contact all of his customers and each person to whom he had already offered or sold NCM Notes. (*Id.*)

On or about December 17, 2004, Defendants gave Mr. Bryant the option of "resigning, or being involuntarily terminated." (*Id.* ¶ 69.) Soon thereafter, Defendants filed a Form U-5 with the NASD and the states of Colorado, Arkansas, and California, stating Mr. Bryant had left their employ "voluntarily" and omitting any information about Mr. Bryant's fraudulent sale of NCM Notes.[2] (*Id.* ¶ 8.) Defendants also stated in their Form U-5 that Mr. Bryant was not the subject of any investigation by a domestic governmental body or any self-regulatory agency and was not under internal review for violating investment-related statutes, regulations, rules, or industry standards of conduct. (*Id.* ¶ 59.) Upon information and belief, Plaintiffs allege that Defendants terminated Mr. Bryant because they had discovered the true facts of the ponzi scheme and they were attempting to avoid liability to investors and disciplinary action by the ASD. (*Id.*)

---

[2]A securities dealer must file a Form U-5 when one of its registered representatives cease to be employed by the dealer. *See, e.g.*, C.R.S. § 11–51–406(5)(a) (2007); Colo. Div. of Secs. Rules, Rule 51-4.5(1A) (effective July 21, 2001).

Defendants continued to mislead the ASD when, on May 12, 2005, they wrote the department stating Mr. Bryant had voluntarily terminated his employment relationship with Defendants. (*Id.* ¶ 69.) Defendants further stated that they believed "Mr. Bryant did not engage in the sale of private money investment notes through [NCM]." (*Id.*) Those statements were false. (*Id.*) Reading Plaintiffs allegations in their most favorable light, if Defendants had properly supervised and investigated Mr. Bryant and/or truthfully reported to state and federal regulatory authorities, these authorities would have taken all necessary action to promptly prohibit Mr. Bryant from selling NCM Notes. (*Id.* ¶ 8.) Further, the ASD justifiably relied on the truthfulness and accuracy of Defendants' filings and assurances in determining not to order Mr. Bryant and NCM to cease and desist from selling NCM Notes. (*Id.* ¶ 49.) When the ASD learned the true facts in November 2006, it immediately issued a Cease and Desist Order against Mr. Bryant and NCM from selling NCM Notes. (*Id.* ¶¶ 10, 51.) The ASD found that during 2004, while Mr. Bryant was a registered representative of Defendants, he sold over $3,000,000 in NCM Notes. (*Id.* ¶ 51.) It further found that during 2005 and 2006, Mr. Bryant sold over $10,000,000 in NCM Notes. (*Id.*)

None of the Plaintiffs could have discovered or by the exercise of reasonable diligence could have known that they were being defrauded by Mr. Bryant in their purchase of NCM Notes until April 2, 2006, when NCM filed for bankruptcy. (*Id.* ¶ 71.) Until that time, Plaintiffs were not aware of the ASD order directing an investigation of Mr. Bryant and his sale of NCM Notes, of Defendants' misrepresentations regarding Mr. Bryant to the ASD, or of Defendants' false and misleading Form U-5. (*Id.* ¶ 73.)

## 2.    Procedural History

On January 16, 2007, Plaintiffs filed a complaint in this court. (Compl. and Jury Demand [filed Jan. 16, 2007].) On February 28, 2007, Plaintiffs filed an amended complaint alleging Defendants: (1) violated the Colorado Securities Act, the Arkansas Securities Act, and the California Corporations Code;[3] (2) violated Arkansas Code sections 23–42–110 and 23–42–205; (3) engaged in outrageous conduct; (4) committed common law fraud; (5) aided and abetted the commission of common law fraud; (6) are liable for negligence per se; (7) are liable for negligent hiring and supervision; (8) are liable for negligent misrepresentation; and (9) are liable for negligence. (Am. Compl.) On March 13, 2007, Defendants filed a motion to dismiss for failure to state a claim. (Defs.' Br.) On March 29, 2007, Plaintiffs filed a response to the motion. (Pls.' Resp.) On April 16, 2007, Defendants replied in support of their motion. (Defs.' Reply.) This matter is fully briefed.

## ANALYSIS

## 1.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6) (2007). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally

---

[3]Plaintiffs have disavowed any interest in pursuing their claims under California law. (Pls.' Resp. to Mot. to Defs. [CFS] and [MSC] to Dismiss Pls.' Am. Compl. Pursuant to Fed. R. Civ. P. 12[b][6] at 13 n.13 [filed Mar. 29, 2007] [hereinafter "Pls.' Resp."].) Thus, I hereinafter decline to address any questions of California law.

sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

Thus, all well-pled factual allegations in a complaint are accepted as true and construed in the light most favorable to the plaintiff. *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). Further, the court is to make all reasonable inferences in the plaintiff's favor. *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1204 (10th Cir. 2002). Prior to the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1974 (2007), dismissal of a complaint was appropriate only when it appeared the plaintiff could prove no set of facts in support of the claims that would entitle him to relief. *Coosewoon v. Meridian Oil Co.*, 25 F.3d 920, 924 (10th Cir. 1994). In *Bell Atlantic*, however, the Supreme Court articulated a new "plausibility" standard, under which a complaint must include "enough facts to state a claim to relief that is plausible on its face." 127 S. Ct. at 1974.

## 2.    *Evaluation of Claims*

Defendants seek dismissal of all of Plaintiffs' claims for the following reasons: (1) the state securities laws on which Plaintiffs rely do not provide for a private right of action; (2) Defendants' actions as alleged were not outrageous as a matter of law; (3) Plaintiffs' common law fraud claim does not support a finding that Defendants made any misrepresentation to Plaintiffs or that Plaintiffs justifiably relied on any such misrepresentation; (4) Defendants could not have aided and abetted in common law fraud because the transactions at issue took place after Mr. Bryant left Defendants' employ; (5) because Plaintiffs have no private right of action under the state securities law at issue, Plaintiffs have no basis for their negligence *per se* claim; (6) Plaintiffs'

common law negligence and negligent hiring and supervision claims are unsupportable because

Defendants owed no duty to Plaintiffs; and (7) Plaintiffs' negligent misrepresentation claim must

fail because even if Defendants did provide misleading information, they did not do so for the

guidance of Plaintiffs. (Defs.' Br.) I consider each count below and Defendants' arguments in

favor of dismissal. In the interests of clarity and logical progression, I do not address the counts

in the order presented in Plaintiffs' complaint.

### a. *Private Right of Action Under State Securities Laws at Issue*

Plaintiffs' first claim for relief asserts, in relevant part, that Defendants' filing of a false and

misleading Form U-5 violated the Colorado and Arkansas securities acts. (Am. Compl. ¶¶

121–29.) Plaintiffs' second claim for relief asserts that Defendants' filing of false and misleading

responses to the ASD's investigative requests violated the Arkansas Securities Act. (*Id.* ¶¶

130–40.) Essentially, Plaintiffs contend that, but for Defendants' misrepresentations, state

regulatory authorities in Arkansas and/or Colorado would have investigated, discovered, and

stopped Mr. Bryant and NCM's ponzi scheme prior to the sales at issue in this case. (*See id.* ¶¶

121–40.) Defendants argue that both of these claims for relief necessarily fail, because the

securities laws on which they rely do not create a private right of action. (Defs.' Br. at 3–8.) I

agree with Defendants.

### i. *The Colorado Securities Act*

Under the Colorado Securities Act, a broker-dealer must file a Form U-5 when a

registered representative ceases to be employed by that dealer. *See* C.R.S. § 11–51–406(5)(a)

(2007); Colo. Div. of Secs. R. 51-4.5(1A) (effective July 21, 2001). Further, Colorado Revised

Statutes section 11–51–502 makes it unlawful for any person "to make or cause to be made, in any document filed with the securities commissioner . . ., any statement which the person knows or has reasonable grounds to know is, at the time and in the light of the circumstances under which it is made, false or misleading in any material respect." C.R.S. § 11–51–502 (2007). Defendants do not dispute that, taking Plaintiffs' well-pled allegations as true, Plaintiffs have alleged sufficient facts to support a finding that Defendants violated Colorado Revised Statutes section 11–51–502 by filing a false and misleading Form U-5. (*See* Defs.' Br. at 5–6.) The parties dispute only whether this statue creates a private right of action for investors. (*See id.*)

Colorado courts consistently caution against inferring a private cause of action absent a showing of the clear legislative intent. *Salazar v. Clancy Sys. Int'l, Inc.*, 155 P.3d 488, 490 (Colo. Ct. App. 2006) (quoting *Minnick v. Denver*, 784 P.2d 810, 812 [Colo. Ct. App. 1989]) ("'If a statute creates legal duties and provides a particular means for their enforcement, the designated remedy excludes all others.'"); *accord Gammill v. United States*, 727 F.2d 950, 953 (10th Cir. 1984). "If a legislative body intends for the statute or ordinance to be used as a basis for civil liability, then its intent should be clearly expressed." *Minnick*, 784 P.2d at 812.

The Colorado Securities Act provides the securities commissioner with enforcement rights both to enjoin any person from engaging in any action or practice constituting a violation of the Act and to seek damages under section 11–51–604 on behalf of investors. C.R.S. § 11–51–602 (2007). In turn, Colorado Revised Statutes section 11–51–604, entitled "Civil liabilities," provides defrauded investors with a right of action to recover losses resulting from certain violations of the Colorado Securities Act. *See id.* § 11–51–604. This section does not establish a

private right of action based on a broker-dealer's failure to file a truthful Form U-5. *See id.* Moreover, the section states that "[i]t does not create any cause of action not specified in this section or section 11–51–602." *Id.* § 11–51–604(12). Section 602 establishes the securities commissioner's right to seek enforcement by injunction under certain circumstances and, thus, is inapplicable to the case *sub judice. Id.* § 11–51–602.

I find the plain language of Colorado Revised Statutes section 11–51–604, which provides several means of enforcing Colorado's securities laws, noticeably excludes any private right of action for investors injured by a broker-dealer making misrepresentations to the state regulatory authority. *See* C.R.S. § 11–51–604 (2007). Moreover, subsection 12 explicitly states that the remedies under the statute are limited and strongly suggests that further remedies should not be inferred. *See id.* 11–51–604(12). Accordingly, I find the Colorado legislature has designated a set of remedies under the Colorado Securities Act to the exclusion of all others. *See Salazar*, 155 P.3d at 490. I, therefore, refuse to infer a private right of action for Plaintiffs to seek redress for Defendants' filing of a false and misleading Form U-5.

Plaintiffs argue against this finding based on several cases in which securities dealers were held liable for investor losses based on their filing of a false Form U-5 under similar facts. (*See* Pls.' Resp. at 16.) The problem for Plaintiffs is that their cited cases do not address whether analogous state securities laws created private rights of action. For instance, in *Palmer v. Shearson Lehman Hutton, Inc.*, 622 So. 2d 1085 (Fla. Dist. Ct. App. 1993) and *Twiss v. Kury*, 25 F.3d 1551 (11th Cir. 1994), which involve strikingly analogous facts to the instant case, the plaintiffs *did not* seek direct enforcement of a state securities law. *See* 622 So. 2d at 1089–91; 25

-14-

F.3d at 1554. Instead, they brought, *inter alia*, *negligence* claims against the securities dealers based on their failure to fulfill their statutory duty of filing a truthful Form U-5. *See* 622 So. 2d at 1089–91; 25 F.3d at 1554. Thus, the cases are irrelevant to the question of whether Plaintiffs have a private right of action based on Defendants' false and misleading filings to the securities commissioner. *SII Investments*, *Inc. v. Jenks*, 370 F. Supp. 2d 1213 (M.D. Fla. 2006), misses the mark even further. Although the *SII Investments* involved an arbitration award based on a securities dealer's filing of a false Form U-5, the court never addressed the merits of the award. 370 F. Supp. 2d at 1214–20. Quite simply, none of Plaintiffs' cases suggest that the Colorado Securities Act, even by analogy, creates a private right of action for investors in the case at bar.

### ii.    *The Arkansas Statutes*

For similar reasons, Plaintiffs have no private right of action under the Arkansas Securities Act. Pursuant to this Act, a broker-dealer who terminates a sales representative must promptly notify the securities commissioner. Ark. Code § 23–42–301(b)(3) (2007); Ark. Secs. Comm'r R. 302.01(E)(3) (effective October 3, 2003). Additionally, section 23–42–110 of the Arkansas Securities Act utilizes the same language as the Colorado Securities Act forbidding false or misleading filings to the securities commissioner. *See* Ark. Code § 23–42–110 (2007). Again, Defendants do not dispute that, taking Plaintiffs well-pled allegations as true, Plaintiffs have alleged sufficient facts to support a finding that Defendants violated section 110 by filing a misleading Form U-5 and providing misleading responses to the ADS in connection with the investigation of Mr. Bryant. (*See* Defs.' Br. at 6–7.) Instead, Defendants contend that the

Arkansas Securities Act provides no private right of action for investors based on a broker-dealer's false and misleading filings.  (*See id.*)

Although neither party was able to identify caselaw directly on point, the Eighth Circuit has, in one case, refused to recognize a private right of action under an Arkansas statute based purely on implication.  *See Wood v. Nat'l Computer Sys., Inc.*, 814 F.2d 544, 546 (8th Cir. 1987). Plaintiffs rely on *Jackson v. Cadillac Club, Inc.*, 986 S.W.2d 410 (Ark. 1999) for proof that Arkansas state courts would imply a private cause of action under the Arkansas Securities Act even without an express grant.  (Pls.' Resp. at 17–18.)  Plaintiffs citation, like those discussed *supra*, is plainly inapplicable.  In *Jackson*, the Arkansas Supreme Court implies civil liability for alcohol vendors who sold alcohol to intoxicated individuals based on the vendor's statutory violation under a *negligence* theory.  986 S.W.2d at 411, 415.  The *Jackson* court did not consider whether the plaintiff could have brought a claim against the defendant directly under the statute it violated.  *See id.*  Thus, *Jackson* is inapposite.

As in Colorado, the Arkansas Securities Act provides the securities commissioner with the right to enforce state securities laws.  *See* Ark. Code § 23–42–209 (2007).  Similarly, section 23–42–106 of the Act is entitled "Civil liability" and provides for limited civil actions by investors, none of which are applicable in the instant case.  *Id.* § 23–42–106.  Unlike the Colorado Securities Act, however, the Arkansas Securities Act does not expressly limit the causes of action available under the Act to those listed in the "Civil liability" section.  *See id.*  Nonetheless, "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."  *Middlesex County*

-16-

*Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14–15 (1981) (quotation marks omitted).

I find that because the Arkansas Securities Act clearly establish a private right of action for investors in a limited set of circumstances, this court cannot imply further rights of action that the state legislature gave no indication it intended to create. Based on the foregoing, I dismiss counts one and two of Plaintiffs' complaint, because the securities laws of Colorado and Arkansas, upon which the counts are based, do not provide for a private right of action to seek redress for a securities dealer's filing of false or misleading forms with the securities commissioner.

### b.      Negligence Per Se[4]

Plaintiffs' sixth count alleges that Defendants' violation of the securities laws of Colorado and Arkansas constitutes negligence *per se*. (Am. Compl. ¶¶ 163–69.) Defendants move to dismiss this claim on the ground that Colorado law does not allow a plaintiff to obtain under a negligence *per se* theory what they could not have obtained by bringing a direct claim under the statute on which the claim is based. (Defs.' Br. at 10–11.) Thus, argue Defendants, because Plaintiffs have no private rights of action under the state securities laws, they cannot assert civil liability under a negligence *per se* theory based on Defendants' purported violation of those laws. (*See id.*) Plaintiffs counter that their cause of action is proper because they are within the class of

---

[4]Because Plaintiffs support all of their claims other than counts one and two exclusively with Colorado caselaw, I hereinafter presume they seek redress under Colorado law alone. (*See* Pls.' Resp. at 23–39.)

persons the securities laws are intended to protect and their injuries were of the kind the statute was enacted to prevent. (Pls.' Resp. at 30–31.) I agree with Plaintiffs.

"Negligence *per se* serves to establish the existence of the defendant's breach of a legally cognizable duty owed to the plaintiff" by adopting the standard of care from a statute or ordinance. *Largo Corp. v. Crespin*, 727 P.2d 1098, 1107 (Colo. 1986). To establish negligence *per se*, the plaintiff must not only show that the defendant violated a statute, he must also show that "he is a member of the class the statute was intended to protect, and that the injuries he suffered were of the kind the statute was enacted to prevent." *Id.* The party seeking to recover under the doctrine must show not only that the defendant violated the statutory standard, but also that the violation was the proximate cause of the injuries sustained. *Id.* at 1107–08.

Here, Plaintiffs' allegations easily support a finding that they are members of the class the Colorado and Arkansas securities acts were intended to protect and that they suffered the kind of injuries the Acts were enacted to prevent. *Largo Corp.*, 727 P.2d at 1107. The Colorado Securities Act itself provides that its purposes are "to *protect investors* and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in capital markets." C.R.S. § 11–50–101(2) (2007) (emphasis added). Moreover, the Act "is remedial in nature and is broadly construed to effectuate its purposes." *Id.*; *Griffin v. Jackson*, 759 P.2d 839, 842 (Colo. Ct. App. 1998) (noting "the Securities Act is remedial in purpose and is designed to protect the public from speculative and fraudulent schemes"). Similarly, "the Arkansas Securities Act was passed primarily for the purpose of protecting members of the public who might invest in offerings by promoters of securities." *McMullen v. Molnaird*, 749 S.W.2d 352, 353 (Ark. 1988).

Further, the Act is remedial in nature and is to be liberally construed to afford protection to the investing public. *Casali v. Shultz*, 292 S.W.2d 836, 837 (Ark. 1987). It is clear to this court that the reporting provisions of the Colorado and Arkansas securities acts are intended to protect the investing public from the perpetration of fraudulent securities schemes such as the one alleged in the instant case. *See Palmer*, 622 So. 2d at 109 ("The reporting provisions [of the Florida Securities Act] and the prohibition of filing false reports with [the state regulatory authorities] . . . are designed to enable [those authorities] to timely obtain truthful information about the conduct of persons registered to sell securities so that it can discipline or otherwise prevent registered persons from practicing fraud upon members of the investing public."); *accord Twiss*, 25 F.3d at 1555–58. Thus, Plaintiffs are members of the class the Colorado and Arkansas securities acts were designed to protect, and their injuries were of the kind the statutes were enacted to prevent.

Defendants urge that, regardless of the foregoing analysis, Plaintiffs may not rely on negligence *per se* to establish liability for violation of the statutes at issue because, as I have decided *supra*, there is no relevant private right of action under any of these statutes. (Defs.' Br. at 13–14.) In support, Defendants cite on *Neiberger v. Hawkins*, 208 F.R.D. 301, 310 (D. Colo. 2002). (*Id.*) In *Neiberger*, plaintiffs brought a negligence *per se* action against a health service provider based on its violation of the Colorado Care and Treatment of Mentally Ill Act. 208 F.R.D. at 309–10. The district court, which had previously held that Colorado

-19-

Care Act did not provide plaintiffs with a private right of action, denied plaintiffs' claim because "[p]laintiffs may not receive through a negligence *per se* claim what they could not receive by bringing a direct claim under the statute." *Id.* at 310.

I disagree with the *Nieberger* court's conclusion. The doctrine of negligence *per se* may provide a plaintiff with a cause of action in negligence that he could not have sustained under the violated statute itself. For instance, the Colorado Supreme court has held that "[a] criminal statute may be relied upon to establish negligence *per se* even thought the statute is silent on the issue of civil liability." *Largo Corp.*, 727 P.2d at 1108; *accord Bittle v. Brunetti*, 750 P.2d 49, 55 (Colo. 1988). Thus, although a individual has no private right of action under most criminal statutes, he may rely upon violation of such statutes to support a negligence *per se* action. *See Largo Corp.*, 727 P.2d at 1108–09; *Bittle*, 750 P.2d at 55. Similarly, violation of regulatory or safety statutes, such as licensing schemes and highway safety laws, although generally enforceable only by the government, may constitute negligence *per se*. *See Schneider v. Midtown Motor Co.*, 854 P.2d 1322, 1326 (Colo. Ct. App. 1992) (upholding lower court's finding that a violation of a regulatory provision "only governing the issuance of temporary registration permits rather than a traffic safety provision" was sufficient to support a finding of negligence *per se*); *Hageman v. TSI, Inc.*, 786 P.2d 452, 454 (Colo. Ct. App. 1989) (finding failure to comply with highway safety regulations may be a basis for a negligence *per se* claim); *see also Largo Corp.*, 727 P.2d at 1109 ("Colorado, like the majority of states, holds that violation of a safety statute is conclusive evidence of negligence."). Thus, my finding that the state securities laws at issue do not provide Plaintiffs with a private right of action is not determinative of their negligence *per se* claim.

Instead, based on my finding that Plaintiffs are members of the class the Colorado and Arkansas securities acts were designed to protect and their injuries were of the kind the Acts were enacted to prevent, I find Plaintiffs have alleged sufficient facts to support their sixth claim based on negligence *per se*. *See Kurly*, 622 So. 2d at 1090 (denying summary judgment on plaintiff's negligence *per se* claim because "a jury could lawfully find that [defendant-securities firm] knowingly and willfully filed with the [state regulatory authorities] false information concerning the reason for [ex-employee/tortfeasor's] termination, in violation of the legal obligations intended to protect investors from such conduct that were imposed on [defendant-securities firm] by [state securities laws]"); *accord Twiss*, 25 F.3d at 1555–56.

### c. *Negligence*

Plaintiffs' ninth count alleges that Defendants' failure to provide truthful, accurate, and complete information to regulatory authorities and the investing public regarding Mr. Bryant and NCM's fraudulent scheme constitutes common law negligence. (Am. Compl. ¶¶ 192–208.) Defendants' sole argument for dismissal of this claim is that they owed no duty of care to Plaintiffs, whose relevant injuries were incurred after Mr. Bryant left Defendants' employ. (Defs.' Br. at 12–14.) Plaintiffs counter that Defendants had an obligation to protect them from the foreseeable injury inflicted by Defendants' employee. (Pls.' Resp. at 32–36.) As will be seen below, I find Defendants did have a duty to protect the financial interests of some Plaintiffs.

In order to state a claim for negligence in Colorado, a plaintiff must allege the following: (1) defendant owed a duty to plaintiff to protect him from injury; (2) defendant breached that duty; (3) plaintiff was injured; and (4) defendant's breach was the proximate cause of plaintiff's

injury.  *See Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992); *HealthONE v. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002).  Defendants contest only that they had a duty to Plaintiffs.  (*See* Defs. Br. at 14–17.)  "The existence and scope of a tort duty is a question of law to be determined by the court.  'The determination that a duty does or does not exist is an expression of the sum total of those considerations which lead the law to say that the plaintiff is [or is not] entitled to protection."  *A.C. Excavating v. Yacht Club II Homeowners Ass'n*, 114 P.3d 862, 866 (Colo. 2005) (quoting *Cary v. United Omaha Life Ins. Co.*, 68 P.3d 462, 465 [Colo. 2003]) (internal citations and further internal quotation marks omitted).  Ultimately, "the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards — whether reasonable people would recognize a duty and agree that it exists."  *HealthONE*, 50 P.3d at 888.

"[A] person generally has no duty to take action for the protection of another even if it is reasonably apparent that such action is necessary to protect the other person from injury or peril."  *English v. Griffin*, 99 P.3d 90, 94 (Colo. Ct. App. 2004); *accord Solano v. Goff*, 985 P.2d 53, 54 (Colo. Ct. App. 1999) (citing Restatement [Second] of Torts § 314 [1965]); *Davenport v. Cmty. Corrs. of Pikes Peak Region*, 942 P.2d 1301, 1305 (Colo. Ct. App. 1997).  Colorado, however has recognized a few, limited circumstances under which such a duty arises:

> In determining whether a defendant owes a legal duty to prevent a third person from harming another, the following factors are generally considered: (1) the existence of a special relationship between the parties; (2) the foreseeability of harm to others; (3) the social utility of the defendant's conduct; (4) the magnitude

of the burden of guarding against injury or harm; and (5) the practical consequences of placing a duty upon the defendant.

*Solano*, 985 P.2d at 54.  I consider each of the *Solano* factors in turn.

### *(1)    Factor One: Special Relationship*

The first factor constitutes Plaintiffs' largest hurdle.  Special relationships typically arise under circumstances in which the defendant had the ability to control the conduct of the tortfeasor or had a custodial, supervisory, or treating relationship with the victim.  *See* Restatement (Second) of Torts § 315 (1965); *English*, 99 P.3d at 94 ("Special relationships typically involve circumstances in which the defendant had either a treating or supervisory relationship with the [victim] or maintained custodial control over the [victim's] environment"); *Solano*, 985 P.2d at 54 (whether a special relationship exists "depends largely upon the ability of the defendant to control the conduct of the third person").  Additionally, the Colorado Supreme Court has recognized that the quasi-fiduciary relationship between an insurer and insured constitutes a special relationship giving rise to a duty of care.  *State Farm Mutual Auto Ins. Co. v. Brekke*, 105 P.3d 177, 189 (Colo. 2004).

In the instant case, because all of the transactions at issue occurred subsequent to Mr. Bryant leaving Defendants' employ, Plaintiffs cannot and do not argue that Defendants had the ability to control Mr. Bryant's conduct at the relevant time.  *See Palmer*, 622 So. 2d at 1089 (finding no special relationship between securities firm and securities broker because injury caused by broker occurred after broker was terminated); *accord Twiss*, 25 F.3d at 1555.  Whether a special relationship existed between Defendants and Plaintiffs presents a more difficult question.

-23-

Plaintiffs point to no rule of law, and this court has identified none, suggesting that Defendants had a special relationship to protect all of its potential customers. (*See* Pls.' Resp.) This is unsurprising, because it is untenable that every employer has a special relationship, giving rise to tort liability based on harm done by third parties, with every *potential* customer or client. *See Poe v. Domino's Pizza*, 139 F.3d 617, 619 (8th Cir. 1998) (upholding district court's determination that because plaintiff was not a customer, restaurant owed her no duty); *Palmer*, 622 So. 2d at 1089 (finding no special relationship because plaintiffs "were never customers [of defendant-brokerage firm] and did not deal with [the employee-broker] at the time he worked for [defendant-brokerage firm]").

According to Plaintiffs' complaint, however, several Plaintiffs were clients of Mr. Bryant *while* he was employed by Defendants — namely, Lillian, John, and Paul Prymak, Preston and Sheila Smith, Jane Specketer, Anthony and Patricia Pisani, Leslie Davis, Marjorie Dale Davis, Darrell and Vera Longley, Robert and Brenda Daley, Richard Brice, Paula Higgins-Brice, Christopher and Sandy Olson, David and Myrna Sobernheim, Tedd Sabus, and Robert and Velva Weston (hereinafter "client-Plaintiffs"). (*See* Am. Compl. ¶¶ 52, 76–120.) I must consider whether this fact gives rise to a duty to protect client-Plaintiffs' financial interests.

A duty to protect financial interests is usually described as a fiduciary duty, which may "by [its] nature automatically trigger an independent duty of care that supports a tort action." *Town of Alma v. Azco Construc., Inc.*, 10 P.3d 1256, 1263 (Colo. 2000). "A fiduciary relationship exists when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of their relationship." *Johnston v. CIGNA, Corp.*, 916 P.2d 643, 646

(Colo. Ct. App. 1996). The Colorado Supreme Court has rejected a *per se* imposition of fiduciary duties on securities brokers. *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 517 (Colo. 1986); *accord FDIC v. Refco Group*, 989 F. Supp. 1052, 1080 (D. Colo. 1997). Instead, the court has held "that proof of practical control of a customer's account by a broker will establish that the broker owes fiduciary duties to the customer with regard to the broker's handling of the customer's account." *Paine*, 718 P.2d at 516. "If the broker has acted as an investment advisor, and particularly if the customer has almost invariably followed the broker's advice, this is an indication that the broker exercises functional control of the account and that the broker-customer relationship is fiduciary." *Id.* "Where a customer relinquishes practical control over his brokerage account to a stockbroker, the broker owes wide-ranging fiduciary duties to the customer to manage the account in accordance with the customer's needs and objectives." *Rupert v. Clayton Brokerage Co.*, 737 P.2d 1106, 1109 (Colo. 1987).

Additionally, a fiduciary relationship, once established between a broker and a client, necessarily extends to the broker-dealer. *See id.* (noting that once employee of defendant-brokerage firm gained control of plaintiff's discretionary account, defendant-brokerage firm "owed a fiduciary duty" to plaintiff); *Johnston*, 916 P.2d at 648 (noting "the brokerage firm and stockbroker owed fiduciary duties to the customer"); *see also Antinoph v. Laverell Reynolds Secs., Inc.*, 703 F. Supp. 1185, 1188 (D. Pa. 1989) (stating "to ensure the broker fulfills his fiduciary duty to protect the investing public, the broker's employer is subject to the same obligations as the individual broker"); *Am. Express Fin. Advisors v. Walker*, 9 Mass. L. Rep. 242, at *20–21 (Mass. Super. Ct. 1998) ("In considering the competing interest of American-Express

and their [sic] clients, I note that, as a broker-dealer, American-Express has a financial duty to protect the interests of its clients, and its financial advisors share a similar fiduciary duty.") .

In the instant case, I find Plaintiffs have alleged sufficient facts to support a finding that client-Plaintiffs — all of whom were Mr. Bryant's clients in 2004 — had a fiduciary relationship with Mr. Bryant, because he had practical control over their accounts and acted as their investment advisor. By way of example, I will detail client-Plaintiff Prymaks' experiences with Mr. Bryant, which serves to establish his control over all client-Plaintiffs' accounts, because the stories of all Plaintiffs are strikingly similar. (*See* Am. Compl. ¶¶ 76–120.) According to Plaintiffs, Mr. Bryant approached the Prymaks in March 2004 and offered his services as a "stockbroker, financial planner, and insurance specialist." (*Id.* ¶ 76.) In May 2004, Mr. Bryant solicited the Prymaks to purchase NCM Notes as the "cornerstone of their financial security" and discouraged them from investing in "risky" stocks. (*Id.*) When the Prymak's savings were exhausted, Mr. Bryant also advised the them to go into debt in order to buy additional NCM Notes. (*Id.*) Mr. Bryant took the Prymaks to U.S. Bank and the Prymaks, following Mr. Bryant's advice, proceeded to take out a home equity line of credit on their home for $400,000, utilizing the proceeds to purchase additional NCM Notes. (*Id.*)

These allegations support a finding that Mr. Bryant acted as client-Plaintiffs' investment advisor and exercised functional control over their brokerage accounts. *See Paine*, 718 P.2d at 516; *Rupert*, 737 P.2d at 1109. Thus, Plaintiffs have alleged sufficient facts to support a finding that Mr. Bryant owed client-Plaintiffs wide-ranging fiduciary duties. *See Rupert*, 737 P.2d at 1109. Based on the foregoing, I find a special relationship — in the form of a fiduciary duty —

existed between Defendants and client-Plaintiffs.[5]  *Solano*'s first factor, therefore, militates in favor of finding that Defendants owed client-Plaintiffs a duty of care.  *Solano*, 985 P.2d at 54.

As discussed above, however, Plaintiffs have pled insufficient facts to support a finding that Defendants had a special relationship with all *potential* clients.  On that basis, I find Defendants owed no duty to protect those Plaintiffs who were *not* clients of Mr. Bryant while he was in Defendants' employ.  *See Bittle*, 750 P.2d at 53 (noting that "absent a special relationship between plaintiff and defendant, [Colorado courts] will not impose a duty on the defendant to take affirmative measures to prevent harm to the plaintiff").

### (2)  *Factors Two Through Five*

Second, I find the alleged injuries to client-Plaintiffs were foreseeable due to Defendants' failure to truthfully report Mr. Bryant's fraudulent scheme to the regulatory authorities and to prohibit Mr. Bryant from advising and selling securities to client-Plaintiffs.  As an initial matter, presuming the allegations in Plaintiffs' complaint to be true and making all reasonable inferences

---

[5]Plaintiffs' claim may have been better pled as a breach of fiduciary duty claim, rather than a negligence claim.  Regardless, because Colorado courts have recognized quasi-fiduciary relationships as the kind of special relationship that may give rise to tort duty to protect, I see no bar to Plaintiffs relying on a full fiduciary relationship to establish a similar tort duty.  *State Farm*, 105 P.3d at 189 (finding quasi-fiduciary nature of insurer-insured relationship creates independent duty of care); *see Highlands Ins. Co. v. Hobbs Group, LLC*, 373 F.3d 347, 355 (3d Cir. 2004) (recognizing a fiduciary relationship is cognizable as special relationship giving rise to a duty of care in negligence actions); *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 478 (5th Cir. 2002) (recognizing that actions against fiduciaries may sound in negligence); *accord Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 421–22 (2d Cir. 1999); *see also Lawyers Title Ins. Corp. v. Rex Title Corp.*, 282 F.3d 292, 294–95 (4th Cir. 2002) (finding plaintiff-insured could bring negligence claim against insurer based on insurer's duty of care as a fiduciary).

in their favor, I find Defendants had knowledge of Mr. Bryant's fraudulent scheme.  Plaintiffs'

allegations suggest that the ASD tipped Defendants off to the scheme and, presumably to avoid

liability on their part, Defendants assured the ASD that after careful investigation, they had

determined Mr. Bryant was not selling NCM Notes.  (*See* Am. Compl. ¶¶ 7, 48.)  Again, making

all reasonable inferences in Plaintiffs' favor, Defendants' decision to terminate Mr. Bryant

stemmed from their discovery that he was indeed engaged in the NCM Notes scheme.  (*See id.*)

Nevertheless, Defendants reported to regulatory authorities that they had undertaken a proper

investigation of Mr. Bryant, that he was not selling NCM Notes, and that he had left Defendants'

employ voluntarily and was not under external or internal investigation.  (*Id.* ¶¶ 7, 8, 59.)  If these

allegations were to be believed, a reasonable juror could conclude that Defendants had knowledge

of Mr. Bryant's fraudulent scheme shortly after the ASD warned Defendants of the suspected

ponzi scheme.  (*See id.* ¶ 7.)  Further, it was foreseeable that Defendants' failure to promptly fire

Mr. Bryant or warn client-Plaintiffs and/or report Mr. Bryant to the appropriate regulatory

authorities was likely to result in some or all of Mr. Bryant's clients being defrauded.  If, on the

other hand, Defendants had protected client-Plaintiffs from Mr. Bryant and/or made truthful

filings to the regulatory authorities, a cease and desist order would likely have been made against

Mr. Bryant.  (*See id.* ¶¶ 49–51.)

That the injuries occurred after the fiduciary relationship between Defendants and client-

Plaintiffs had ceased to exist is of no consequence under the facts of this case.  While I recognize

that there is caselaw finding no duty to protect a third party absent a special relationship *at the

time of injury*, I find the caselaw distinguishable. *See, e.g.*, *Priester v. Lowndes County*, 354 F.3d

414, 422 (5th Cir. 2004). My research has revealed that such cases generally involve a duty to protect individuals from physical violence based on the defendant's ability to control the actions of the tortfeasor or the environment of the victim. *See, e.g.*, *id.* at 422 (finding school was not responsible for injury to a student during an after-school activity, because the special relationship between the school and the student existed only during activities in which he was compelled by the school to participate); *T.W. v. Regal Trace, Ltd.*, 908 So. 2d 499, 503 (Fla. Dist. Ct. App. 2005) ("Currently, the duty to protect strangers against the tortious conduct of another can arise, if at the time of injury, the defendant is in actual or constructive control of: 1. the instrumentality; 2. the premises on which the tort was committed; or 3. the tortfeasor.") (quotation marks omitted). When the defendant's ability to control the conduct of a party is the potential basis for a tort duty to protect, society will not presume that the defendant's level of control is sufficient to warrant burdening him with the duty to protect unless he controls either the tortfeasor, the instrumentality of the tort, or the third party at the time of the injury. However, Defendants' duty in the instant case does not arise from their ability to control client-Plaintiffs or Mr. Bryant. It arises from their obligation as a fiduciary to take certain actions to protect the financial interests of client-Plaintiffs. Plaintiffs allege several breaches of that duty in 2004, prior to Mr. Bryant's termination. (*See* Am. Compl. ¶ 76.) That some of the foreseeable consequences of those breaches did not occur until 2005 and 2006 certainly does not militate against burdening Defendants with the duty to protect client-Plaintiffs in 2004. Thus, the custody and control cases are simply not analogous to a case, such as this one, involving a special relationship based on a fiduciary duty. Based on the foregoing, I find Plaintiffs have alleged sufficient facts to support a

finding that injury to client-Plaintiffs based on Defendants' false and misleading filings and failure to protect client-Plaintiffs from Mr. Bryant's fraud was likely and foreseeable. Thus, the second *Solano* factor weighs in favor of finding a duty to protect.

Third, this court can identify no social utility in a dealer-broker failing to report illegal behavior by one of its employees, failing to promptly terminate such an employee, and/or failing to prohibit such an employee from advising and selling securities to clients. Defendants have not argued to the contrary. (*See* Defs.' Br.; Defs.' Reply.) In fact, the Colorado legislature has implicitly determined that Defendants' alleged conduct — protecting an employee engaged in a scheme to defraud investors — is without social utility by passing laws requiring securities firms to truthfully report their reasons for terminating an employee. *See* C.R.S. § 11–51–460 (5)(a) (2007). Thus, I find the third *Solano* factor also weighs in favor of finding a duty to protect.

Regarding the fourth and fifth *Solano* factors, I find the magnitude of the burden on Defendants in having to make truthful filings to securities commissioners and having to protecting clients from receiving financial advice and assistance from a registered representative known to be engaged in fraudulent scheme is virtually non-existent when weighed against the real potential for significant investor losses absent such protection. In fact, because making truthful filings to regulatory authorities is required by the securities laws of Colorado, no additional burden is imposed by requiring the same under tort law. In that sense, in considering the fifth factor, I find that virtually no practical consequences flow from requiring Defendants to truthfully report to the securities commissioner, because such reporting is required by law. Similarly, requiring a broker-dealer to take actions to protect its clients from being advised by a registered representative

*known* to be involved in a scheme to defraud investors has virtually no practical consequences other than those that would flow from running a typical brokerage firm. It is fundamental to the success of any broker-dealer that it must protect its client-investors from known fraud. Thus, all five *Solano* factors militate in favor of finding Defendants have a duty to protect client-Plaintiffs' financial interests. *Solano*, 985 P.2d at 54.

These considerations, as well as common sense, support a finding that reasonable people would recognize a duty exists on the part of broker-dealer to protect the financial interests of clients of their registered representatives by prohibit those representatives who are known to be engaged in a scheme to defraud investors from selling securities to clients and/or by truthfully reporting to the regulatory authorities regarding the fraud. *See HealthONE*, 50 P.3d at 888. Accordingly, I find Plaintiffs have alleged sufficient facts to support a finding that Defendants owed client-Plaintiffs — but not Plaintiffs who became clients of Mr. Bryant after he left Defendants' employ — a duty of care. Because Defendants do not dispute that Plaintiffs have alleged sufficient facts to support a finding of breach, causation, and damages, I deny Defendants' motion to dismiss Plaintiffs' ninth count based on common law negligence, insofar as the motion pertains to client-Plaintiffs. The motion will be granted insofar as it pertains to the remaining, non-client Plaintiffs.

### d. Negligent Hiring & Supervision

Plaintiffs' seventh claim for relief alleges that Defendants were negligent in hiring and supervising Mr. Bryant, because: (1) Defendants knew or reasonably should have known that Mr. Bryant had a dangerous propensity of "selling away," which almost invariably involves the illegal

and fraudulent sale of securities; and (2) had Defendants properly supervised Mr. Bryant, they would have stopped him from selling NCM Notes. (Am. Compl. ¶¶ 170–82.) Defendants argue this claim warrants dismissal because they owed Plaintiffs no duty of care for injuries incurred after Mr. Bryant left their employ. (Defs.' Br. at 14–17.) Plaintiffs counter that because the injuries were foreseeable, Defendants are liable for negligent hiring and supervision. (Pls.' Resp. at 32–36.)

Colorado recognizes the torts of negligent hiring and negligent supervision. *DeStefano v. Grabrian*, 763 P.2d 275, 286–88 (Colo. 1988). Negligent hiring predicates liability on the "employer's hiring of a person under circumstances antecedently giving the employer reason to believe that the person, by reason of some attribute of character or prior conduct, would create an undue risk of harm to others in carrying out his or her employment responsibilities." *See Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1321 (Colo. 1992). Similarly, to establish liability for negligent supervision, "the plaintiff must prove that the employer ha[d] a duty to prevent an unreasonable risk of harm to third persons to whom the employer knows or should have known the employee would cause harm." *Keller v. Koca*, 111 P.3d 445, 448 (Colo. 2005). "The scope of the employer's duty of care in making hiring decisions [and supervising employees] extends to persons the employer should have reasonably foreseen the employee — who possesses the dangerous propensity the employer knew of, or reasonably should have known of — would come into contact with through the employment." *Raleigh v. Performance Plumbing & Heating, Inc.*, 130 P.3d 1011, 1018 (Colo. 2006) (negligent hiring); *Keller*, 111 P.3d at 448 (negligent supervision). "In order for a duty of care to exist, there must be a connection between the

employer's knowledge of the employee's dangerous propensities and the harm caused." *Keller*, 111 P.3d at 450.

### i. *Negligent Hiring*

Defendants do not deny that Plaintiffs have alleged sufficient facts to support a finding that Defendants knew or had reason to know of Mr. Bryant's history of "selling away," and that such a history created an undue risk of harm to others in carrying out his employment responsibilities. (*See* Defs.' Br.; Defs.' Reply.) Nor do Defendants contest that there was a direct causal link between Mr. Bryant's alleged propensity to engage in fraud and the injuries at issue. (*See* Defs.' Br.; Defs.' Reply.) Instead, Defendants urge that the scope of their duty to hire with care did not extend to Plaintiffs. (Defs.' Br. at 15–16.) I agree with Defendants that they owed no duty of care to Plaintiffs who did not come into contact with Mr. Bryant through the course of his employment. *See Raleigh*, 130 P.3d at 1018 (noting employer's duty extends to individuals with whom the employee would foreseeably "come into contact with *through* the employment") (emphasis added). However, making all reasonable inferences in favor of Plaintiffs, client-Plaintiffs foreseeably came into contact with Mr. Bryant through the course of his employment by Defendants. (*See* Am. Compl. *passim.*; Defs.' Br.; Defs. Reply.) Nonetheless, Defendants contend that because they did not owe a duty to client-Plaintiffs at the time the fraudulent transactions at issue occurred, they cannot be liable for negligent hiring. (Defs.' Br. at 15–16.) I disagree.

Defendants have pointed to no rule of law protecting employers from liability for foreseeable harm done by their former employees to the employer's former clients. (*See* Defs.'

-33-

Br.; Defs.' Reply.)  Unlike *respondeat superior* actions, negligent hiring actions do not predicate

employer liability on the employee acting as an agent of the employer.  *Raleigh*, 130 P.3d at 1016

(noting "[t]he tort of negligent hiring is independent of a *respondeat superior* theory; under

appropriate circumstances, this tort may apply to impose liability even though the employee is

acting outside the scope of employment").  "'Liability results . . . not because of the relation of

the parties, but because the *employer antecedently had reason to believe that an undue risk of*

*harm would exist because of the employment.*'"  *Id.* at 1017 (quoting Restatement [Second] of

Agency § 213, cmt. d [1965]) (emphasis in *Raleigh*).  With respect to negligent hiring, the

Colorado Supreme Court has pointed out that the "key word in this formulation, 'antecedently,'

refers to the time of hiring."  *Id.*  Thus, the primary inquiry is whether *at the time of hiring* the

employer had reason to foresee the complained of harm.  *See Hutchinson by Hutchinson v.*

*Luddy*, 742 A.2d 1052, 1058 (Pa. 1999) (finding "[l]iability exists not because of when the injury

occurs, but because the actor has brought into contact or association with the other a person

whom the actor knows or should know to be peculiarly likely to commit intentional misconduct")

(internal quotation marks omitted).

　　　Defendants do not dispute that, at the time of hiring, Defendants had reason to foresee

that Mr. Bryant might defraud his clients.  (*See* Defs.' Br.; Defs.' Reply.)  That the fraud at issue

occurred after Mr. Bryant left Defendants' employ does not make the injuries any less foreseeable.

The association between Mr. Bryant and client-Plaintiffs was occasioned by his job as a

representative of Defendants.  (*See* Am. Compl. ¶¶ 76–120.)  By allowing Mr. Bryant to act as a

registered representative, Defendants essentially sanctioned Mr. Bryant's relationship with client-

Plaintiffs as a securities dealer. By retaining Mr. Bryant and then presenting as if he left Defendants' employ voluntarily and under no suspicion, Defendants never affirmatively withdrew this sanction. Under these circumstances, I find it was reasonably foreseeable that Mr. Bryant would indulge in his previously known propensity to "sell away" in order to defraud client-Plaintiffs both during and after he left Defendants' employ. This finding, considered along with Defendants' fiduciary duty toward client-Plaintiffs, ineluctably leads me to the conclusion that Plaintiffs have pled sufficient facts to support a finding that Defendants had a duty of care to protect client-Plaintiffs from Mr. Bryant's known dangerous propensities, even after terminating Mr. Bryant. *See Doe v. Garcia*, 961 P.2d 1181, 1183 (Idaho 1998) (finding a genuine issue of material fact as to whether a hospital was negligent in hiring an employee who harmed a former patient after the employee was terminated); *Marquay v. Eno*, 662 A.2d 272, 281 (N.H. 1995) (holding "liability might exist for abuse after school hours or after graduation where, but for the hiring and retention of the abusing employee, there would have been no relationship between the abuser and victim"); *see also Hutchinson*, 742 A.2d at 1058–59 (noting "employers have been held liable for criminal conduct by off-duty employees or former employees where such conduct was consistent with a propensity of which the employer knew or should have known, and the association between the plaintiff and employee was occasioned by the employee's job"). Thus, I deny Defendants' motion to dismiss Plaintiffs' negligent hiring claim with respect to client-Plaintiffs.

### ii. *Negligent Supervision*

Based on the essentially the same analysis, I deny Defendants' motion to dismiss Plaintiffs' negligent supervision claim with respect to client-Plaintiffs. Plaintiffs allege Defendants are liable for negligently supervising Mr. Bryant, because they failed to stop him from selling NCM Notes and failed to report him to the appropriate regulatory authorities. (Am. Compl. ¶¶ 170–82.) Again, Defendants' sole basis for seeking dismissal of this claim is that they owed Plaintiffs no duty to supervise Mr. Bryant in 2005 and 2006 when the fraudulent transactions at issue occurred. (Defs.' Br. at 16–17.) For the same reason as discussed regarding negligent hiring, I find Defendants owe no duty to supervise Mr. Bryant to Plaintiffs who were not clients of Mr. Bryant's while he was employed by Defendants.

However, Defendants did owe client-Plaintiffs a duty to supervise Mr. Bryant with care. Reading Plaintiffs allegations in the most favorable light, near June 2004, Defendants became of aware of Mr. Bryant's NCM Notes scheme. (Am. Compl. ¶¶ 7, 48.) Based on this finding, Plaintiffs have made a sufficient showing that Defendants "ha[d] a duty to prevent an unreasonable risk of harm to [client-Plaintiffs] to whom the employer knew or should have known the employee would cause harm." *Keller*, 111 P.3d at 448. Thus, I find Plaintiffs have adequately pled that Defendants owed client-Plaintiffs a duty to supervise Mr. Bryant and may be held liable for breach of said duty causing injury after Mr. Bryant's tenure with Defendants came to an end. *See Doe*, 961 P.2d at 1183 (finding a genuine issue of material fact as to whether the hospital could have prevented injury to a patient by a former employee *after* the patient was discharged and *after* the employee was terminated by taking action to supervise the employee

during the patient's hospitalization); *Hutchinson*, 742 A.2d at 1058 (finding liability for negligent supervision occurs "not because of when the injury occurs, but because the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct") (internal quotation marks omitted).

Because Defendants do not challenge Plaintiffs' allegations of breach, causation, or damages, I presume the allegations are sufficient. (*See* Defs.' Br.; Defs.' Reply.) Based on the foregoing, I deny Defendants' motion to dismiss Plaintiffs' seventh claim based on negligent hiring and negligent supervision with respect to client-Plaintiffs.

### e.      *Negligent Misrepresentation*

Plaintiffs' eighth claim for relief alleges Defendants are liable for negligent misrepresentation because they made false and misleading filings to federal and state regulatory authorities, which prevented those authorities from taking immediate actions against Mr. Bryant and NCM. (Am. Compl. ¶¶ 183–91.) Defendants move to dismiss this claim because, even if they did make such misrepresentations: (1) they were not made for the guidance of Plaintiffs in their business transactions; and (2) because they were not publicly available, Plaintiffs could not have relied on them. (Defs.' Br. at 17–21.) I need only address Defendants' first argument.

"Negligent misrepresentation may occur if a person, in the course of his or her business, profession, or employment, supplies false information to another for guidance in his or her business transactions, and the other suffers a pecuniary loss caused by justifiable reliance upon the false information." *Branscum v. Am. Cmty. Mut. Ins. Co.*, 984 P.2d 675, 679 (Colo. Ct. App. 1999). Further, liability for the tort "'is limited to loss suffered . . . by the person or one of a

limited group of persons for whose benefit and guidance [the alleged tortfeasor] intends to supply the information or knows that the recipient intends to supply it.'" *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank, N.A.*, 892 P.2d 230, 236 (Colo. 1995) (quoting Restatement [Second] of Torts § 522). Plaintiffs do not dispute that Defendants' responses to ADS investigative requests and Form U-5 filing were not publicly available. (*See* Defs.' Br. at 19; Pls.' Resp.) Further, Plaintiffs admit:

> The purpose of accurate responses to investigative requests is to inform the regulatory authorities of the true and accurate facts so those authorities can properly determine whether to take enforcement action against persons involved in unlawful activities to protect investors. The purpose of the Form U-5 is to advise the regulatory authorities and investors of any information that relates to illegal activities and investigations of their associated persons and the true reasons for the termination of such associated persons.

(Am. Compl. ¶ 185.) Quite simply, Plaintiffs have failed to allege any facts that could support a finding that any of Plaintiffs are a "person or one of a limited group of persons for whose benefit and guidance [Defendants] intend[ed] to supply the information or [knew] the recipients intend[ed] to supply it."[6] *Mehaffy*, 892 P.2d at 236. Accordingly, I dismiss Plaintiffs' eighth count based on negligent misrepresentation.

---

[6]Plaintiffs' citation to *Stichting Pensioenfonds, ABP v. Qwest Communs. Int'l, Inc.* misses the mark. In *Stichting*, a federal district court of Colorado upheld a claim by an investor in Qwest stock for negligent misrepresentation based on Qwest's public dissemination of false information. No. 04–RB–0238 (CBS), 2005 U.S. Dist. LEXIS 9026, at *69–70 (D. Colo. Mar. 29, 2005). The court specifically found that the information was publicly available and "known to be used *as a guide by those investing in Qwest stock*." *Id.* at *68–69 (emphasis added). Plaintiffs have proffered no allegations to support such a finding in the instant case.

### *f.* *Outrageous Conduct and Intentional Infliction of Emotional Distress*

Plaintiffs' third claim for relief alleges that Defendants' failure to fully investigate, report, and immediately terminate Mr. Bryant after learning of his engagement in the ponzi scheme constitutes actionable outrageous conduct. (Am. Compl. ¶¶ 141–48.) Defendants contend this count should be dismissed because Plaintiffs have not alleged sufficient facts to support a finding that: (1) Defendants engaged in extreme and outrageous conduct; and (2) the conduct at issue was undertaken recklessly or with the intent to cause Plaintiffs severe emotional distress. (Defs.' Br. at 8–11.) I need only address Defendants' first argument.

"Proof of the tort of outrageous conduct must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the ineluctable conclusion is the infliction of severe mental suffering was calculated or recklessly and callously inflicted." *Gard v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994); *accord Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. Ct. App. 2003). Conduct that could be illegal or that some might consider reprehensible does not necessarily rise to the level of that which is sufficiently "outrageous." *See* Restatement (Second) of Torts § 46, cmt. d (1965) ("It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."). A claim for outrageous conduct contemplates only acts that are "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rugg v. McCarty*, 476 P.2d 753, 756

(Colo. 1970); *accord Donaldson v. Am. Banco Corp., Inc.*, 945 F. Supp. 1456, 1465 (D. Colo. 1996).

Plaintiffs are correct in pointing out that the Tenth Circuit has upheld damages for outrageous conduct in the context of a securities suit. (*See* Pls.' Resp. at 23–26 [citing *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 447 F. Supp. 543 (D. Colo. 1977), *aff'd in relevant part* 703 F.2d 1152 (10th Cir. 1981)].) Nonetheless, I find Defendants' conduct in the case at bar was not sufficiently outrageous to be actionable. In *Malandris*, the court upheld a jury verdict based on the outrageous conduct of a stockbroker employed by Merrill Lynch, whose inexcusably off-base financial advice robbed the plaintiff of his life savings. 477 F. Supp. at 545–47. In that case, Merrill Lynch was liable for the stockbroker's actions on the basis of *respondeat superior*, because its managerial staff "approved and participated" in the stockbroker's misconduct. *Id.* at 546. In case *sub judice*, however, Plaintiffs do not and cannot allege *respondeat superior* liability, because Mr. Bryant was not in Defendants' employ at the time of the fraudulent transactions at issue. (Am. Compl. ¶¶ 6, 52.) Thus, Defendants' role in Mr. Bryant's misconduct is significantly more attenuated than the role of Merrill Lynch in *Malandris*. Plaintiffs have pointed to no cases finding outrageous conduct in broker-dealer's failure to report or stop misconduct leading to financial losses, (*see* Pls.' Resp. at 23–29), and this court's research has revealed none. Based on the foregoing, I find Defendants' failure to report and/or attempt to stop Mr. Bryant's fraudulent scheme is insufficient as a matter of law to support a finding of outrageous conduct. I, therefore, dismiss Plaintiffs' third claim for relief based on outrageous conduct.

### g. Common Law Fraud

Plaintiffs' fourth claim for relief alleges that because Defendants concealed and intentionally made false statements regarding Mr. Bryant's fraudulent activities, they are liable for common law fraud. (Am. Compl. ¶¶ 149–52.) Defendants move to dismiss Plaintiffs' claim on the grounds that: (1) Defendants' alleged misrepresentations were made to state regulators, not to Plaintiffs; and (2) Plaintiffs' allegations of reliance are insufficient as a matter of law. (Defs.' Br. at 11–12.) Again, I need only address Defendants' first argument.

In Colorado, the elements of fraud are:

> (1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it was false; (3) ignorance on the part of the one to whom the representation was made of its falsity; (4) the representation was made with an intention that it be acted on; and (5) the representation resulted in damage.

*S.E. Colo. Water Conservancy Dist. v. Cache Creek Mining Trust*, 854 P.2d 167, 172 (Colo. 1993). Similarly, the elements of fraudulent concealment are:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*Ballow v. Phico Ins. Co.*, 875 P.2d 1354, 1361 (Colo. 1993). "Common to both fraudulent concealment and fraudulent misrepresentation is the element of reliance on either the false representation or the assumption that the concealed fact does not exist." *Nielson v. Scott*, 53 P.3d 777, 780 (Colo. Ct. App. 2002).

Defendants contend that because the alleged misrepresentations were not made to Plaintiffs and were not even publicly available, Plaintiffs' fraud claim must fail. (Defs.' Br. at 11–12.) I agree. I find Plaintiffs cannot state a claim for fraudulent misrepresentation based on misrepresentations of which they were unaware. I have found no cases recognizing fraudulent misrepresentation on such a basis, and Plaintiffs have identified none. (*See* Pls.' Resp.)

In truth, Plaintiffs' claim sounds in fraudulent concealment rather than fraudulent misrepresentation. Plaintiffs' allegations suggest that Defendants concealed Mr. Bryant's fraudulent scheme from them, not just from state and federal regulators. (*See* Am. Compl. *passim*.) Still, reading Plaintiffs' allegations in the most favorable light and making all reasonable inferences in Plaintiffs' favor, they fail to allege any facts that could support a finding that Defendants concealed Mr. Bryant's fraudulent scheme from Plaintiffs with the intent "to cause [Plaintiffs] to act differently than [they] might otherwise have done if the information had been disclosed." *Kopeikin v. Merchants Mort. & Trust Corp.*, 679 P.2d 599, 602 (Colo. 1984). Here, Plaintiffs have specifically alleged that Defendants' intent in concealing Mr. Bryant's scheme was to protect themselves from liability under state and federal law, rather than to induce Plaintiffs to invest in NCM Notes with Mr. Bryant. (*See* Am. Compl. ¶ 48.) Based on the foregoing, I dismiss Plaintiffs' fourth claim for relief based on common law fraud claim.

### h.    *Aiding and Abetting Common Law Fraud*

Plaintiffs' fifth claim for relief alleges that because Defendants substantially assisted Mr. Bryant in the offer and sale of NCM Notes by making false filings with regulatory authorities and concealing the fact of the fraud from Plaintiffs, Defendants are liable for aiding and abetting

common law fraud. (Am. Compl. ¶¶ 153–62.) Defendants argue for dismissal of this claim because they did not knowingly and substantially assist Mr. Bryant in selling NCM Notes. (Defs.' Br. at 10.) I agree with Defendants.

"Liability for aiding and abetting a tortious act will be found if the party whom the defendant aids performs a wrongful act that causes an injury, the defendant is generally aware of his role as part of the overall illegal or tortious activity at the time that he provides the assistance, and defendant knowingly and substantially assists in the principal violation." *Holmes v. Young*, 885 P.2d 305, 308 (Colo. Ct. App. 1994). The problem for Plaintiffs is that the tortious acts at issue all occurred after Mr. Bryant left Defendants' employ. (*See* Am. Compl. ¶¶ 6, 52.) Plaintiffs, however, do not allege that Defendants played any role in directly assisting Mr. Bryant's fraudulent scheme after 2004 or that Defendants had actual knowledge that Mr. Bryant continued selling NCM Notes in 2005 and 2006. (*See id.*) Failure to report or stop Mr. Bryant's tortious activities in 2004 simply does not constitute "knowingly and substantially assisting" in Mr. Bryant's tortious conduct in 2005 and 2006. Plaintiffs have proffered no cases suggesting otherwise. (*See* Pls.' Resp. at 29–30.) Accordingly, I dismiss Plaintiffs' fifth claim for relief based on aiding and abetting common law fraud.

**3.    *Conclusion***

Based on the foregoing it is therefore ORDERED that:

1.    Defendants' motion to dismiss (#28) is GRANTED in part and DENIED in part.

2.    The clerk shall forthwith enter judgment in favor of Defendants and against Plaintiffs,

a.   dismissing Plaintiffs' first, second, third, fourth, fifth, and eighth claims for relief against all Plaintiffs with prejudice; and

b.   dismissing Plaintiffs' seventh and ninth claims for relief against non-client Plaintiffs (Kenneth N. Porchetta, Linda Radley, Marie Mlacnik, The Tucker Family Investments, LLP, Richard Warren, Helen Barker, Gary and Phyllis Whitaker, Marcy and James Rice, Michael J. and Bryan Vette, William J. Kitching, Floroann Milann, Helena Loewen, Russell A. Buttacavoli, Shawn Cullen, Jonathan and Virginia Sendor, Jill Sendor-Laychak, Douglas Laychak, Ali Gidfar, Maryam Zirakzadeh, Manouchehr and Shahin Zirakzadeh, Charles B. Davis, Timothy J. Gillach, Lisa and Scott Seeberger, Joan E. McElwain, Harley J. and Carol J. Kirschenmann, Priscilla J. Dressen, Leroy Matticks, Edward and Roberta Morrow, Irene and Robert Valverde, James and Marian Faville, James E. Losher, Vivian Kallas, and Fred Fraley) with prejudice.

Dated this 29th day of November, 2007.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge